IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| GEORGE "TOM" NEMSKY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 07-CV-0205-MJR |
| | ) | |
| INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 399, and CONOCOPHILLIPS COMPANY, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM and ORDER**

**REAGAN, District Judge:**

On March 21, 2007, Tom Nemsky filed a two-count complaint under Section 301 of the Labor Relations Act, 29 U.S.C. § 185, against Defendants, International Union of Operating Engineers, Local 399 ("Local 399" or "the Union"), and ConocoPhillips Company. In Count One, Nemsky alleges that Local 399 breached its duty to fairly represent him when it gave away the right to grieve or arbitrate a positive test under ConocoPhillips's Substance Abuse Policy ("SAP"). In Count Two, Nemsky alleges that ConocoPhillips breached its collective bargaining agreement with Local 399 when it discharged him without just cause.

Local 399 and ConocoPhillips filed motions for summary judgment (Docs. 37, 41), to which Nemsky responded jointly (Doc. 50). Local 399 and ConocoPhillips filed replies (Docs. 57, 58). Local 399 also filed a motion for sanctions, which is fully briefed (Docs. 39, 46, 51, 56). The Court heard oral argument on all pending motions on October 17, 2008. This matter being fully briefed and the parties having been heard, the Court begins its analysis with a brief recitation of the

factual background and procedural history.

## **Factual Background and Procedural History**

ConocoPhillips operates a refinery in Wood River, Illinois, where it refines petroleum and delivers oil products. Nemsky was employed at the ConocoPhillips Wood River Refinery for approximately 22 years until his employment was terminated on September 21, 2006. At the time of his termination, Nemsky worked as an operating engineer.

Local 399 is the labor union that represents the bargaining unit employees employed by ConocoPhillips at its Wood River refinery. The employment of bargaining unit employees, including Nemsky, is governed by a collective bargaining agreement ("CBA") negotiated by ConocoPhillips and Local 399. Article 20 of the CBA, the "Employee Discipline" clause, provides in part:

> An employee may be disciplined, including discharge, only for just cause....
>
> 1. Whenever an employee is discharged, he will be given a written notice stating the reasons for such discharge....
>
> 2. If after full compliance with the foregoing procedure the complaint is not settled in a satisfactory manner, a duly designated representative of Local 399, International Union of Operating Engineers, may submit the complaint to arbitration under the procedure set out in Article 18 provided such request for arbitration is made to the Company within seven (7) days (Saturdays, Sundays, and holidays excluded) of the date the Refinery Management gives a duly designated representative of Local 399, Internal Union of Operating Engineers, its decision.
>    (a) It is understood and agreed that the arbitrator shall determine whether the Company had just cause for discipline. Doc. 23. Exhibit A.

On April 1, 2004, ConocoPhillips implemented a revised SAP for all of its employees at United States work sites. The SAP provided for random drug and alcohol testing of its employees. Doc. 23, Exhibit B. It established that "[i]t is a violation of this policy for employees to report for duty or remain on duty (a) with any detectable trace amount ... of any illegal drug,

alcohol or controlled substance...." *Id*. The Alcohol Misuse Prevention Plan implementing the policy defined "detectable trace amount" as an alcohol concentration of .040 or greater. Doc. 23, Exhibit C, p. 6. The Plan provides, "The consequence of any confirmed positive test result greater than 0.04 will be termination." *Id*. at p. 24. The SAP was distributed to all ConocoPhillips employees. Doc. 23, Exhibit D.

Local 399 filed a grievance regarding the policy prior to its April, 2004 implementation, demanding that ConocoPhillips "cease and desist" from implementing the policy, but ConocoPhillips maintained that its position was not arbitrable. *See* Doc. 38, Exhibit 2, Machino Affidavit, Attachment B ("Machino Aff.")[1]. The Union also filed an unfair labor practices charge against ConocoPhillips with the National Labor Relations Board ("NLRB") for failing and refusing to bargain in good faith "by unilaterally implementing a change to the existing drug and alcohol policy." Machino Aff., Attachment C. The NLRB dismissed the charges, stating that, based on its investigation, further proceedings were not warranted because of insufficient evidence. *Id*. Machino testified that an NLRB agent told him that an appeal "would be a waste of time" because "this board would not approve it ... and that was as far as it would go." Doc. 38, Exhibit 1, Machino Deposition 31:16-19 ("Machino Dep."). The minutes of the December 21, 2004 union meeting reflect that members were advised that the NLRB dismissed their charge and that it appeared they had "little avenue for relief." Machino Aff., Attachment D.

The Union's negotiations with ConocoPhillips resulted in the January 27, 2005 Memorandum of Agreement ("MOA"). Machino Aff., Attachment H. In the MOA, the Union gained the right to arbitrate chain of custody issues, a right which, according to Refinery Committee

---

[1] George Machino is the Business Representative of Local 399.

Chairman and Assistant Business Agent Floyd Fessler, no other ConocoPhillips location had or has. Doc. 38, Exhibit 3, Fessler Deposition 49:22-25 ("Fessler Dep."). Additionally, the MOA resulted in the return to work of two employees who had been discharged under the SAP. Fessler Dep. 35:23-36:3. At the February 15, 2005 union meeting, members were advised of the agreement and were told that it was available on the ConocoPhillips website. Machino Aff., Attachment D.

On September 20, 2006, Nemsky reported to work at 6:45 A. M., drove to his work area and got his equipment to test for combustibles. Doc. 38, Exhibit 5, Nemsky Deposition 13:4-14; 14:5-8. ("Nemsky Dep."). While securing the area that motor vehicles would be allowed to enter, Nemsky kicked over a can of pipe cement which got on his coveralls and shoe. *Id*. 13:20-23. He went into the bathroom and used a contact cleaner degreasing solvent to remove the pipe cement. *Id*. Nemsky then received a call from his supervisor that he had been randomly selected for a drug and alcohol test. *Id*. 15:6-8.

Nemsky reported to Pat Denier, a nurse and Breath Alcohol Technician employed by ConocoPhillips. *Id*. 16:12-14. Nemsky was aware that the zero tolerance policy level was .04. *Id*. 16:22-25. It is undisputed that Nemsky's blood alcohol level was tested four times between 7:43 A. M. and 9:56 A. M., with the following results: .043, .044, .026 and .000. *See* Doc. 24, Exhibit A. After the second test, Nemsky called Fessler who told him to get a blood test as soon as possible to attempt to show that the breath analyzer was inaccurate. *Id*. 17:5-20. Nemsky told a human resources employee, Lynette Zierges, that he needed to leave immediately, but she told him that he could not leave until his blood alcohol level was at .000. *Id*. 17:22-18:9. Zierges did, however, offer to call him a cab around 8:20 A. M., prior to the urinalysis test for drugs. *Id*. 18:12, 18:20. At 8:30 A.M., Nemsky completed the urinalysis, which was negative. He told Denier that he had taken

Robitussin before work, but Denier responded that Robitussin would not affect an alcohol test. *Id*. 20:22-21:2. ConocoPhillips terminated Nemsky's employment on September 21, 2006.

Nemsky grieved his termination, which was processed through the fourth step of the grievance procedure, the last step before arbitration. *Id*. 26:13-19. Machino felt that Nemsky's failure to get a blood test had doomed any hope of the Union's succeeding on the grievance. Machino Dep. 49:15-18. Machino regarded the blood test as part of the continuum of the chain of custody, and a negative-for-alcohol blood test could have justified the Union's taking the position that there was a flaw in the process. *Id*. 49:15-25; 50:2-9. On March 21, 2007, Nemsky filed charges with the NLRB against Local 399 and ConocoPhillips, which were dismissed. Concurrently, he filed the instant action, in which he denies that he violated the SAP and maintains that he was terminated without "just cause."

### **Standard Governing Summary Judgment**

Summary judgment should be granted when "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" **Bevolo v. Carter, 447 F.3d 979, 982 (7th Cir. 2006),** *quoting* **Fed. R. Civ. P. 56(c), and** *citing* **Ezell v. Potter, 400 F.3d 1041, 1046 (7th Cir. 2005), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).**

In assessing whether summary judgment is warranted, the Court must construe all evidence, plus the inferences reasonably drawn from the evidence, in the light most favorable to the non-moving party. **Sallenger v. Oakes, 473 F.3d 731, 739 (7th Cir. 2007),** *citing* **Leaf v. Shelnutt, 400 F.3d 1070, 1078 (7th Cir. 2005).** The mere existence of an alleged factual dispute is not

sufficient to defeat a summary judgment motion. ***Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986);** *Salvadori v. Franklin School District,* **293 F.3d 989, 996 (7th Cir. 2002).** Rather, to successfully oppose summary judgment, the nonmovant must present definite, competent evidence in rebuttal. *Salvadori,* **293 F.3d at 996,** *citing Vukadinovich***, 278 F.3d at 699.**

## Analysis

Nemsky has filed a hybrid Section 301/fair representation suit claiming that ConocoPhillips breached the CBA and that Local 399 breached the duty of fair representation it owes to its members. *See Reed v. United Transp. Union***, 488 U.S. 319, 328 (1989);** *McLeod v. Arrow Marine Transp., Inc.***, 258 F.3d 608, 612-13 (7th Cir. 2001).** In order for a plaintiff to prevail in such an action, he must have a meritorious claim against both the union and the employer; the claims are interlocking in the sense that neither is viable if the other fails. ***Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1241 (7th Cir. 1997).** The Court will address Local 399 and ConocoPhillips's arguments in turn.

**1. Whether Local 399 breached its duty of fair representation to Nemsky**

A union breaches the duty of fair representation only if its actions are arbitrary, discriminatory or in bad faith. ***Vaca v. Sipes*, 386 U.S. 171, 190 (1967).** Each of these possibilities must be considered separately in determining whether or not a breach has been established. *See **Ooley v. Schwitzer Div., Household Mfg. Inc.*, 961 F.2d 1293, 1302 (7th Cir. 1992)**, *citing Air Line Pilots Ass'n, Int'l v. O'Neill***, 499 U.S. 65 (1991);** *see also, e.g.*, *Crider***, 130 F.3d at 1243.**

To be "arbitrary," a union's conduct toward its members must be "so far outside a wide range of reasonableness that it is wholly irrational or arbitrary." *Air Line Pilots Ass'n***, 499 U.S. at 78.** The United States Supreme Court has emphasized that the arbitrary prong of the analysis

is very deferential and has held that "a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness,' as to be irrational." ***Air Line Pilots Ass'n*, 499 U.S. at 67.** Applying this standard, a court "will not substitute [its] judgment for that of the union, even if, with the benefit of hindsight, it appears that the union could have made a better call." ***McKelvin*, 124 F.3d at 867.** This great degree of deference is warranted because Congress did not intend for courts to interfere with the decisions of the employee's chosen bargaining representative. *Id.* As a result, "so long as a colorable argument could be made at the time of the union's decision to drop its support that the grievance is meritless, the decision cannot be regarded as arbitrary." *Id.* **at 867-68.**

In this case, a rational jury could not find that the Union failed this test, as there is no evidence of any conduct that even approaches being outside a "wide range of reasonableness." Local 399 grieved the policy change with ConocoPhillips and filed an unfair labor practice charge with the NLRB. Neither of these efforts was successful, and the NLRB agent advised Machino that an appeal would be futile. Machino was also aware of two arbitration awards involving the implementation of the SAP at ConocoPhillips's Borger, Texas refinery. Machino Aff. Attachments I, J. Both arbitrators denied the grievances because they found that ConocoPhillips had the authority, under the CBA, to unilaterally revise the SAP to reflect that an employee would be discharged if he tested positive for the first time on a random test. *Id.* Under these circumstances, the Union felt that it got the best deal that it could get when it had two employees reinstated who had been discharged under the policy and reserved the right to grieve and arbitrate chain of custody issues. Fessler urged Nemsky to immediately have a blood test which could have made a chain of custody argument possible, but Nemsky failed to follow through on Fessler's suggestion. This

foreclosed the argument that was the one avenue of relief that Local 399 had been able to negotiate for its members. Even with the benefit of hindsight, this Court cannot find that the Union's decision is so far outside a wide range of reasonableness as to constitute "wholly irrational or arbitrary" action.

As to whether Local 399's conduct was discriminatory and in bad faith, while the two must be analyzed separately, the analyses look to the subjective motivation of the Union officials. ***Trnka v. Local Union No. 688, UAW*, 30 F.3d 60, 63 (7th Cir. 1994).** There needs to be proof that the union acted (or failed to act) due to an improper motive. ***E.g., Crider*, 130 F.3d at 1243; *Trnka*, 30 F.3d at 63; *Ooley*, 961 F.2d at 1304.**

Nemsky first argues that Local 399 acted in bad faith in choosing not to arbitrate his grievance. Nemsky asserts that Local 399 has given three different, inconsistent reasons why it did not proceed to arbitration: (1) Fessler stated that arbitration had not taken place and he was uncertain if it was still an option; (2) Machino stated that Local 399 did not pursue Nemsky's grievance under the chain of custody theory because Nemsky did not get a blood test; and (3) Machino stated that the grievance was not arbitrated when Nemsky filed charges against the Union with the NLRB for not proceeding to arbitration. The Union's failure or refusal to arbitrate a grievance because a member filed charges against it would be a breach of the duty of fair representation. *See* **29 U.S.C. § 411(a)(4) ("No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency.");** *see also NLRB v. Union of Industrial Marine Shipbuilding Workers,* **391 U.S. 418, 424 (1968)**.

As to this latter, and most serious allegation, the Court has reviewed the relevant

portion of Machino's deposition. It reads as follows:

> Q. Is there any other reason other than the fact that he didn't go to the hospital that the union didn't push his termination to arbitration?
>
> A. Any other reasons. Well, quite frankly, it got stopped when he filed the charges against us for not doing it, and it was pending at the time.
>
> Q. So why would the fact he filed a Section 301 claim against the union stop the union from arbitrating his termination?
>
> \* \* \*
>
> A. He took the position that we weren't going to.
>
> Q. So why would that stop you? If he took the position that the Cubs are a better baseball team than the Cardinals, why -- that wouldn't stop it?
>
> A. It was stopped on the basis we didn't feel we had a case because he didn't comply. And at that point, he quit communicating with us in regards to -- he took the position we weren't going to do it, so we were kind of out of bounds at that point in time.
>
> Q. Is there any other reason that you didn't take the chain of custody to arbitration other than what you've told me?
>
> A. Not that I can recall. Machino Dep. 51:23-53:2.

Read in context, Machino's explanation is not that Local 399 terminated arbitration because Nemsky filed an NLRB charge against them; rather, it is Machino's testimony that the Union terminated arbitration because (1) the Union felt it had no case since Nemsky did not comply with Fessler's urging that he have a blood test; and (2) Nemsky stopped communicating with the Union because he took the position that the Union was not going to arbitrate the issue. Even if the Court were to accept Nemsky's reading of Machino's testimony and were to find that the Union breached its duty of fair representation, Nemsky cannot prevail because, as discussed below, he has no meritorious claim against ConocoPhillips.

The Court finds that Nemsky's other two arguments are meritless. First, Nemsky does not explain the relevance of Fessler's testimony that he was "not one hundred per cent certain" whether Nemsky's case could still proceed to arbitration and that he did not know why it had not gone to arbitration. Doc. 38, Exhibit 4, Fessler Deposition 60:4-18. This testimony does not appear to add weight to the scales on either side of the argument. Second, Nemsky asserts that the argument that the Union failed to pursue his grievance under the chain of custody theory because he failed to have a blood test is "irrational, preposterous and disingenuous." However, in rather contradictory fashion, Nemsky makes chain of custody arguments when he contends that the breath analyzer showed a "false positive." For example, Nemsky argues that Denier handled the mouthpiece of the breath analyzer with an ungloved hand, that she left the room for 15 minutes after the first test when she was supposed to remain with him, that his blood alcohol level rose between the first and second tests, and that the breath analyzer had a .005 degree of error. A blood test that was negative for alcohol would certainly have been useful to the Union in arguing that the process, the chain of custody, was flawed. Additionally, Fessler was aware of another employee, Kevin Beers, who had gotten a blood test after "blowing" over .04. Fessler Dep. 56:11-21. About 45 minutes after Beers's breath analyzer test dropped to .000 and he left the facility, Beers had a blood test which showed a blood alcohol level of zero. *Id*. 56:16-17; 57:11-14. Fessler testified that the result was that Beers received a $5,000.00 settlement. *Id*. 56:22-57:2. For these reasons, the Court finds that the evidence falls far short of demonstrating bad faith by the Union towards Nemsky.

Nemsky offers no evidence that his arbitration was abandoned for a discriminatory reason. He merely offers, without elaboration as to how the action was discriminatory, the following statement, "Machino inadvertently (one surmises) admitted that Nemsky's pending arbitration was

abandoned for an illegal, retaliatory, discriminatory and bad faith reason." Doc. 50, p. 22. The record is devoid of any evidence that Local 399's actions were discriminatory towards Nemsky.

On October 27, 2008, the Court granted Nemsky's motion for leave to supplement by citing additional authority (Doc. 72). Nemsky drew the Court's attention to *Orth v. Wisconsin State Employees Union,* **---F.3d----, 2008 WL 4646051 (7th Cir. 2008)**, a case decided by the Seventh Circuit Court of Appeals just five days after the Court heard oral argument in this matter. Specifically, Nemsky pointed to the Seventh Circuit's reaffirmance of the principle that a union, in the context of negotiating changes, owes a fiduciary duty to the individuals it represents.

In *Orth*, the Seventh Circuit stated, "the union ... is a fiduciary, and its duty of fair representation is simply another name for 'fiduciary duty.'" **2008 WL 4646051 at 4**. This being the case, the undersigned District Judge does not see that calling the union's duty a "fiduciary duty" rather than a duty of fair representation adds anything to Nemsky's argument. Furthermore, in *Orth*, an ERISA case, the Union had an unwritten, secret side deal with the employer which was a clear breach of the plan manager's fiduciary duty to plan participants and beneficiaries. *Id*. The evidence in the instant case is that the "deal" between Local 399 and ConocoPhillips was neither unwritten nor secret. Information regarding the written MOA was disseminated at union meetings and on ConocoPhillips's website. Nothing in the *Orth* decision alters the Court's opinion as to the instant action.

For all of these reasons, the Court finds that Local 399 did not breach its duty of fair representation. Local 399's actions were not arbitrary, discriminatory or in bad faith. *See Vaca***, 368 U.S. at 171.** As a result, the Court grants summary judgment in favor of Local 399 as to Count One of Nemsky's complaint.

## 2. Whether ConocoPhillips breached the collective bargaining agreement

As stated previously, in order for a plaintiff to prevail in a hybrid § 301 action, he must have a meritorious claim against both the union and the employer; the claims are interlocking in the sense that neither is viable if the other fails. ***Crider*, 130 F.3d at 1241.** In the opinion of the undersigned District Judge, Local 399 did not breach its duty of fair representation, and Nemsky's claim against Local 399 is not viable. In turn, Nemsky's claim against ConocoPhillips would also fail. The Court will, however, also consider this matter in the alternative and will delve into Nemsky's claims against ConocoPhillips.

To prevail against an employer in a § 301 action, a plaintiff must show that the employer breached the CBA and that the union breached its duty of fair representation. ***Bell v. DaimlerChrysler Corp*., --- F.3d ----, 2008 WL 4724384, 5 (7th Cir. 2008)**. Nemsky claims that under the CBA, his employment could only be terminated for cause. As a result, in terminating his employment when no cause existed, ConocoPhillips breached the contract that existed between the Union and ConocoPhillips.

On April 1, 2004, ConocoPhillips implemented a revised SAP for all of its employees at United States work sites under authority granted to it in Article 21 of the CBA, which provides as follows:

**ARTICLE 21**
**COMPANY RULES AND REGULATIONS**

> Company Wood River Rules and Regulations will be made from time to time by the Company which will not be in conflict with anything contained in this Agreement. The Company will furnish affected employees such Rules and Regulations a violation of which may result in discipline, up to and including discharge. Doc. 23. Exhibit A.

This Article reserves to ConocoPhillips the authority to make rules and regulations which will not

be in conflict with the CBA and which may result in termination of employment.

The implementation of the SAP is a reasonable use of rule-making authority. Providing a drug- and alcohol-free workplace serves important public policies. The public has a strong interest in ensuring its own safety and the safety of employees that "plainly justifies prohibiting covered employees from using alcohol or drugs on duty, or while subject to being called for duty." *Skinner v. Railway Labor Executives' Ass'n,* **489 U.S. 602, 621(1989)**. This is particularly true where there is a substantial danger to employees and the public such as that posed by an oil refinery. *See id*. On the day that Nemsky failed his alcohol test, he was securing an area where cars could not enter because, potentially, there were volatile and dangerous substances in the area that could ignite if there was a spark. It is patently in the interest of everyone within this dangerous zone, including Nemsky, that no employee working there should have alcohol in his system. On this basis, even if the policy was not properly adopted, ConocoPhillips could terminate Nemsky for "just cause."

As set forth in greater detail above, the SAP provided that "[t]he consequence of any confirmed positive test result will be termination." Doc. 23, Exhibit B. Nemsky is correct in asserting that nothing within the SAP indicates that a confirmed first-time positive test is not subject to grievance or arbitration. Rather, in the January 27, 2005 MOA, Local 399 and ConocoPhillips agreed that termination under the SAP would not be subject to the CBA's grievance and arbitration provisions.

The MOA settled all disputes and claims between Local 399 and ConocoPhillips with respect to the SAP. Machino Aff., Attachment H. The MOA stated that "a confirmed positive test under the Company's Substance Abuse Policy for any employee *shall be cause* for immediate

termination and such termination shall not be subject to the grievance and arbitration provisions of the Collective Bargaining Agreement." *Id.* (emphasis added). This contractual agreement provided ConocoPhillips with the authority to terminate Nemsky, and his termination was not subject to the CBA's grievance and arbitration provisions. Nemsky argues that the MOA did not indicate that the Union was amending the CBA to remove the critical "just cause" provision. However, the MOA was a bright-line agreement, providing that a confirmed positive test *constituted cause*, making unnecessary grievance or arbitration of the issue to determine "just cause." The plain language of the document is that the Union maintained only "the right to grieve and arbitrate the integrity of the chain of custody process of the policy." Doc. 23, Exhibit E.

Nemsky argues that ConocoPhillips's unilateral implementation of the SAP violated the CBA and that there was no negotiation, only "take it or leave it." However, the NLRB dismissed charges brought by both the Union and by Nemsky. Nemsky argues that the NLRB's responses were just form letters. Those letters represent, nonetheless, the NLRB's determination that further proceedings were not warranted and that the claims must be dismissed.

Based on these facts, the Court finds that the alcohol policy was properly adopted and was effective at the time Nemsky was discharged for violation of the policy. For all of the above reasons, the Court finds that ConocoPhillips did not breach the CBA. The Court grants summary judgment in favor of ConocoPhillips and against Nemsky as to Count Two of Nemsky's complaint.

Since Nemsky has failed to show that ConocoPhillips breached the CBA, even if the Court had found that the Union had breached its duty of fair representation, Nemsky's § 301 action must fail. *See Bell,* **2008 WL 4724384 at 5**.

**3. Whether the statute of limitation has run as to Nemsky's claims**

The Court notes that Local 399 and ConocoPhillips asserted in their motions for summary judgment that they are entitled to summary judgment because Nemsky failed to commence this action within six months of January 27, 2005, the date Local 399 and ConocoPhillips entered into the MOA. While Local 399 and ConocoPhillips are correct that there is a six-month statute of limitation as to Nemsky's claims, the Court finds that Nemsky's claims are not barred by the applicable statute of limitation.

In *DelCostello v. Int'l Brotherhood of Teamsters*, **462 U.S. 151, 155 (1983)**, the Supreme Court held that an employee's "hybrid" suit against an employer for breach of a collective bargaining agreement and a union for breach of its duty of fair representation was subject to the six-month statute of limitations found in § 10(b) of the National Labor Relations Act, **29 U.S.C. § 160(b)**. The statute of limitations begins to run "when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged [violation]." *Christiansen v. APV Crepaco, Inc.*, **178 F.3d 910, 914 (7th Cir. 1999)**, *citing Metz v. Tootsie Roll Industries, Inc.*, **715 F.2d 299, 304 (7th Cir. 1983).** "'Accrual is the date on which the statute of limitations begins to run. It is not the date on which the wrong that injures the plaintiff occurs, but the date - often the same, but sometimes later - on which the plaintiff discovers that he has been injured.' Suffice it to say, both elements must be present for accrual and it doesn't matter which came first: The claim accrues on the date of discovery or the date plaintiff should have discovered [his] injury, unless the injury is later." *Salmanis v. American Postal Workers Union, AFL-CIO,* **2001 WL 219650, n. 9,*4 (N.D. Ill. 2001)**, *quoting Cada v. Baxter Healthcare Corp.,* **920 F.2d 446, 449 (7th Cir. 1991)**. "Application of this general rule turns on the context in which the claim arose." *Pulliam v. United Auto Workers*, **354 F.Supp.2d 868, 872 (W.D. Wis. 2005)**.

In the case at bar, the clock on Nemsky's claims began to run from the time of his termination from employment or the time that he discovered, or reasonably should have discovered, that Local 399 could only challenge the chain of custody and could not grieve or arbitrate a positive test under the SAP. *See Chapple v. Nat'l Starch & Chemical Co.*, **178 F.3d 501, 505 (7th Cir. 1999).** The determination of the accrual date involves an objective inquiry; plaintiff's asserted actual knowledge is not determinative if he did not act reasonably and "in effect, closed [his] eyes to evident and objective facts concerning accrual of [his] right to sue." *Noble v. Chrysler Motors Corp.*, **32 F.3d 997, 1000 (6th Cir. 1994).** The Court agrees with Nemsky that he did not discover the ultimate import of the MOA until at least his termination on September 21, 2006. Indeed, it may have been later when he discovered the meaning of chain of custody and that this was the only issue that the Union could grieve and arbitrate. *Salmanis*, **2001 WL 219650 at 3,** *citing Hood v. Sweetheart Cup Co.*, **816 F.Supp. 720, 725 (S.D.Ga.1993) ("In hybrid suits, cause of action accrues on the date that the plaintiff knew or should have known of the union's or the employer's final action, whichever occurs later.").** There is nothing in the record before the Court that establishes that Nemsky learned or should have learned that a confirmed positive test was not subject to grievance and arbitration any earlier than September 21, 2006. *Cf. Pulliam v. United Auto Workers*, **354 F.Supp.2d 868, 872 (W.D. Wis. 2005);** *Konen v. Int'l Brotherhood of Teamsters*, **255 F.3d 402 (7th Cir 2001).** Therefore, the Court finds that Nemsky's claims began to run no earlier than September 21, 2006. And, as Nemsky filed this suit on March 21, 2007, it is timely.

**4. Local 399's motion for sanctions**

Local 399 moves for sanctions pursuant to **FEDERAL RULE OF CIVIL PROCEDURE**

**11(b)**. (Doc. 39). The Union asserts that sanctions are warranted, because it demonstrated to Nemsky's counsel that there was no genuine issue as to any material fact and that it was entitled to judgment as a matter of law. Local 399 advised Nemsky's counsel that it had not breached any duty owed to Nemsky and that Nemsky's lawsuit, as to Local 399, was untimely. The Union requests that the Court sanction Nemsky and his counsel for violation of Rule 11(b) and that the Court award the Union its reasonable expenses, including attorneys' fees, incurred in the preparation and filing of the motions for sanctions and for summary judgment. Having carefully reviewed the parties' arguments for and against the imposition of sanctions, the Court declines to award sanctions.

**Rule 11(b)** provides that, by filing a pleading, an attorney certifies that the pleading is not being presented for any improper purpose (such as needlessly to increase the cost of litigation), the claims and legal contentions contained therein are warranted by existing law "or by a nonfrivolous argument for the extension ... of existing law," and the allegations and factual contentions contained therein have evidentiary support. The Rule authorizes a district court to sanction lawyers or parties for submissions filed for an improper purpose or without a reasonable investigation of the facts and law necessary to support their claims. ***Senese v. Chicago Area I.B. of T. Pension Fund*, 237 F.3d 819, 824 (7th Cir. 2001),** *citing Fries v. Helsper*, **146 F.3d 452, 458 (7th Cir.),** *cert. denied*, **525 U.S. 930 (1998);** *Mars Steel Corp. v. Continental Bank N.A.*, **880 F.2d 928, 932-33 (7th Cir. 1989)(en banc).** A frivolous argument is one that is "baseless or made without a reasonable and competent inquiry." ***Independent Lift Truck Builders Union v. NACCO Materials Handling Group, Inc.* 202 F.3d 965, 968-69 (7th Cir. 2000).**

Although the Court ultimately determined that summary judgment must be granted in favor of Defendants, Nemsky's case was not barred by the statute limitations, and the record does

not reveal that Nemsky had an improper purpose in filing this lawsuit. Nemsky's counsel's response, exhibits and oral argument satisfied his burden of showing reasonable inquiry prior to filing the complaint. Nemsky's claims were not devoid of factual and legal foundation. The Court is not persuaded that Nemsky's counsel's arguments were frivolous or that he unreasonably or vexatiously multiplied these proceedings. For all these reasons, the Court denies the Union's motion for sanctions (Doc. 39).

## **Conclusion**

The Court **GRANTS** Defendant International Union of Operating Engineers, Local 399's, motion for summary judgment (Doc. 37), **GRANTS** ConocoPhillips Company's supplemental motion for summary judgment (Doc. 41) and **DENIES** Defendant International Union of Operating Engineers, Local 399's, motion for sanctions. Accordingly, the Court **DIRECTS** the Clerk of the Court to enter summary judgment in favor of Defendants International Union of Operating Engineers, Local 399, and ConocoPhillips Company and against Plaintiff George "Tom" Nemsky. This case is now **CLOSED**.

**IT IS SO ORDERED.**

**DATED this 4th day of November, 2008**

                                              **s/Michael J. Reagan**
                                              **MICHAEL J. REAGAN**
                                              **United States District Judge**